Evan J. Smith
BRODSKY & SMITH
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:     516.741.4977
Facsimile:     516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ANDREW SASSER,<br><br>Plaintiff,<br><br>vs.<br><br>CARROLS RESTAURANT GROUP, INC., DAVID HARRIS, HANNAH CRAVEN, THOMAS B. CURTIS, DEBORAH M. DERBY, MATTHEW DUNNIGAN, LAWRENCE E. HYATT, MATTHEW PERELMAN, ALEXANDER SLOANE, and JOHN D. SMITH.<br><br>Defendants. | Case No.:<br><br>**Complaint For:**<br><br>(1)  Violation of § 14 (a) of the Securities Exchange Act of 1934<br>(2)  Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Andrew Sasser ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this stockholder action against Carrols Restaurant Group, Inc. ("Carrols" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," and collectively with the Company, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a

result of Defendants' efforts to sell the Company to Restaurant Brands International Inc., ("Parent") through merger vehicle BK Cheshire Corp ("Merger Sub," and together with Parent "RBI") as a result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed all cash transaction (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in a January 16, 2024, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the Definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the agreement, Carrols shareholders will receive $9.55 per share in an all-cash transaction, or an aggregate total enterprise value of approximately $1.0 billion.

3.      Thereafter, on March 4, 2024, the Company filed its Preliminary Proxy Statement on Schedule 14A with the United States Securities and Exchange Commission (the "SEC").

4.      The Proposed Transaction is unfair for a number of reasons. Significantly, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits. For example: (a) Company insiders own company options, restricted stock units, and other equity awards, all of which are subject to accelerated vesting and conversion into merger consideration; and (b) certain Company executives are entitled to severance packages, often referred to as "golden parachute" packages, entitling same to millions of dollars not shared by Plaintiff and other Company common stockholders.

5.      In violation of the Exchange Act, Defendants caused to be filed the materially deficient Preliminary Proxy Statement with the SEC in an effort to solicit public stockholders such as Plaintiff to vote his Carrols shares in favor of the Proposed Transaction.

6.      The Preliminary Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed and rational decision of whether to vote in favor of the Proposed Transaction, and is thus in violation of the Exchange Act.  As detailed below, the Preliminary Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Carrols, provided by Company Management to the Company, the Special Transaction Committee's (the "Special Committee") financial advisor Jefferies LLC ("Jefferies"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinion created by Jefferies, and provided to the Board.

7.      Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff. This action seeks to enjoin the Proposed Transaction.

## PARTIES

8.      Plaintiff is a citizen of New Hampshire and, at all times relevant hereto, has been a Carrols stockholder.

9.      Defendant Carrols, through its subsidiaries, operates as a restaurant company in the United States. Carrols is incorporated under the laws of the State of Delaware and has its principal place of business at 968 James Street, PO Box 6969, Syracuse, NY 13203. Shares of Carrols common stock are traded on the NASDAQ Capital Markets under the symbol "TAST".

10.      Defendant David Harris ("Harris") has been the Chairman of the Board of Directors of the Company at all relevant times.

11.      Defendant Hannah Craven ("Craven") has been a director of the Company at all relevant times.

12.     Defendant Thomas B. Curtis ("Curtis") has been a director of the Company at all relevant times.

13.     Defendant Deborah M. Derby ("Derby") has been a director of the Company at all relevant times. Defendant Derby also serves as the Company's President and Chief Executive Officer ("CEO").

14.     Defendant Matthew Dunnigan ("Dunnigan") has been a director of the Company at all relevant times.

15.     Defendant Lawrence E. Hyatt ("Hyatt") has been a director of the Company at all relevant times.

16.     Defendant Matthew Perelman ("Perelman") has been a director of the Company at all relevant times.

17.     Defendant Alexander Sloane ("Sloane") has been a director of the Company at all relevant times.

18.     Defendant John D. Smith ("Smith") has been a director of the Company at all relevant times.

19.     Defendants identified in ¶¶ 10-18 are collectively referred to as the "Individual Defendants."

20.     Non-Party Parent operates as a quick-service restaurant company in Canada, the United States, and internationally.

21.     Non-Party Merger Sub is a wholly owned subsidiary of Parent created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

23.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company's stock trades on the NASDAQ Stock Exchange which is headquartered in this District.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

25.     Defendant Carrols, through its subsidiaries, operates as a restaurant company in the United States. The company operates as a Burger King and Popeyes franchisee.

26.     The Company's most recent financial performance press release, revealing financial results from the quarter preceding the announcement of the Proposed Transaction, indicated sustained and solid financial performance. For example, in the November 9, 2023, press release announcing its 2023 Q3 financial results, the Company highlighted such milestones as:

Total restaurant sales increased 7.2% to $475.8 million in the third quarter of 2023, compared to $444.0 million in the third quarter of 2022; Comparable restaurant sales for the Company's Burger King® restaurants increased 8.1%; Comparable restaurant sales for the Company's Popeyes® restaurants increased 11.7%; and Adjusted Net Income was $10.0 million, or $0.16 per diluted share, compared to Adjusted Net Loss of $7.3 million, or $0.14 per diluted share, in the prior year quarter.

27.     Speaking on these positive results, CEO Defendant Derby commented on the Company's positive financial results as follows, "We are pleased to report yet another quarter of exceptional performance for Carrols, demonstrated by strong comparable sales growth at our Burger King and Popeyes restaurants, along with a 74% increase in our restaurant-level profitability. We were thrilled to achieve positive traffic growth at our Burger King restaurants earlier than anticipated, with great traction on recent product launches, such as the BK Royal Crispy Wraps, which significantly outperformed expectations in the third quarter. Equally important, we delivered continued improvement in our speed of service and guest satisfaction scores, as our team members worked hard to provide our guests with an excellent experience in our restaurants."

28.     CEO Defendant Derby continued that sentiment by stating, "During the quarter, we generated free cash flow of over $30 million, driving a reduction in our total net leverage ratio to 2.8 times. As we look to 2024 and beyond, we are focused on continuing the momentum of our strong results and positive traffic growth."

29.     These positive results are not an anomaly, but rather, are indicative of a trend of continued financial success by Carrols. Based upon these positive financial results and outlook, the Company is likely to have future success.

30.     Despite this upward trajectory and continually increasing financial results, the Individual Defendants have caused Carrols to enter into the Proposed Transaction without providing requisite information to the Company's stockholders such as Plaintiff.

***The Flawed Sales Process***

31.     As detailed in the Preliminary Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed to effectuate a sale of the Company to RBI.

32.     The Preliminary Proxy Statement fails to adequately disclose why the Special Committee was given the power to reject any potential transaction but was not given the power of final approval for entering into a potential transaction. The Company Board is not wholly independent and disinterested; and therefore, should not have had the final say in entering into the Proposed Transaction.

33.     In addition, the Preliminary Proxy Statement is silent as to the nature of the confidentiality agreement entered into between the Company and RBI and whether this agreement differed from any other agreement with potentially interested third parties discussed and/or not specifically mentioned by the Preliminary Proxy Statement, if so in all specific manners.

34.     Moreover, the Preliminary Proxy Statement fails to adequately disclose any and all communications regarding post-transaction employment during the negotiation of the underlying transaction.

35.     It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

*The Proposed Transaction*

36.    On January 16, 2024, Carrols and RBI issued a joint press release announcing the

Proposed Transaction. The press release stated, in relevant part:

**TORONTO**, January 16, 2024 – Restaurant Brands International Inc. ("RBI" or the "Company") (TSX: QSR) (NYSE: QSR) (TSX: QSP) and Carrols Restaurant Group, Inc. ("Carrols") (NASDAQ: TAST) today announced that they have reached an agreement for RBI to acquire all of Carrols issued and outstanding shares that are not already held by RBI or its affiliates for $9.55 per share in an all cash transaction, or an aggregate total enterprise value of approximately $1.0 billion, representing a 23.1% premium to Carrols 30-day volume-weighted average price as of January 12, 2024 and a 13.4% premium to the January 12, 2024 closing price.

Carrols is the largest Burger King® franchisee in the United States today, operating 1,022 Burger King restaurants in 23 states that generated approximately $1.8 billion of system sales during the twelve-months ended September 30, 2023. Carrols also owns and operates 60 Popeyes® restaurants in six states.

Tom Curtis, President of Burger King U.S. and Canada commented, "Carrols has demonstrated strong and improving restaurant operations over the years. This acquisition is an exciting accelerator to our *Reclaim the Flame* plan that is focused on relentlessly pursuing a better experience for our Guests. We are going to rapidly remodel these restaurants over the next five years or so and put them back into the hands of motivated, local franchisees to create amazing experiences for our Guests."

Deborah Derby, President and CEO of Carrols said, "Today's announcement is a testament to our more than 24,000 Carrols team members who have helped drive the company to record levels of profitability over the past 12 months. These results have allowed us, through this transaction, to deliver immediate and certain value to Carrols shareholders at an attractive premium to the Company's current and historical share prices. Additionally, we believe our team members will now have additional opportunities as part of the greater RBI family – in our office, in the field and especially in our restaurants, including for long-time managers who may want to become franchisees themselves. We look forward to working closely with Tom and the rest of the Burger King team in the months and years ahead."

Josh Kobza, CEO of RBI added, "This is a terrific example of our commitment to put our capital to work to accelerate growth and support Tom and his team in their broader efforts to have a more competitive Burger King restaurant base. The strategic merits of this acquisition are very compelling and consistent with our objective to invest our capital in long-term, high-return opportunities."

**Strategic Rationale and Future Plans for Portfolio**

The transaction is part of Burger King's *Reclaim the Flame* plan to accelerate sales growth and drive franchisee profitability. The transaction follows the brand's initial $400 million investment announced in September 2022 to drive high quality remodels, improve operations, enhance marketing, and support ongoing technology and digital priorities.

Burger King expects to significantly accelerate Carrols' current rate of remodels to bring the acquired portfolio to modern image over the next five years. To accomplish this, the team plans to invest approximately $500 million of capital, funded by Carrols' operating cash flow, to remodel approximately 600 acquired restaurants that are not currently considered modern image.

Carrols has a team of strong, experienced operators who, in partnership with Burger King's operations teams, will operate the acquired restaurants. Burger King ultimately plans to refranchise the vast majority of the portfolio to new or existing smaller franchise operators who live in their local communities. Following refranchising the acquired restaurants, which we expect will be completed in five to seven years, Burger King will maintain a company restaurant portfolio of a couple of hundred restaurants for strategic innovation, training, and operator development purposes.

**Transaction Details**

Under the terms of the merger agreement, RBI will acquire all of Carrols issued and outstanding shares that are not already held by RBI or its affiliates for $9.55 per share in an all-cash transaction. This represents a premium of 23% to Carrols' 30 trading-day volume-weighted average price as of January 12, 2024, and implies a total enterprise value of approximately $1.0 billion. RBI and its affiliates currently hold approximately 15% of Carrols outstanding equity.

A special transaction committee of Carrols' Board of Directors comprised of independent directors unaffiliated with RBI (the "Special Committee"), advised by independent legal and financial advisors, was formed to conduct a deliberate and thoughtful process to evaluate this proposal. Transaction negotiations were led by the Special Committee and following its unanimous recommendation, the Carrols Board of Directors (other than directors affiliated with RBI) unanimously approved the merger agreement with RBI and agreed to recommend that Carrols stockholders vote to adopt the merger agreement. The definitive merger agreement includes a 30-day "go shop" period that will allow the Company to affirmatively solicit alternative proposals from interested parties.

The transaction is expected to be completed in the second quarter of 2024 and is subject to expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as well as other customary closing conditions, including approval by the holders of a majority of common stock held by Carrols stockholders excluding shares held by RBI and its affiliates

and officers of Carrols in addition to approval by holders of a majority of outstanding common stock of Carrols.

The transaction is not subject to a financing contingency and is expected to be financed with cash on hand and term loan debt for which RBI has received a financing commitment.

RBI expects the transaction to be approximately neutral to Adjusted Earnings per Share. Net leverage giving effect to the transaction will increase minimally and the Company will remain on track to reach its previously stated net leverage target of mid-four times by the end of 2024.

Affiliates of Cambridge Franchise Holdings, LLC, who in aggregate own or control approximately 17% of outstanding Carrols shares and approximately 20% of outstanding Carrols shares held by stockholders unaffiliated with RBI, have entered into a voting agreement pursuant to which they have agreed, among other things, to vote their shares of common stock of Carrols in favor of the transaction.

### *Potential Conflicts of Interest*

37.    The breakdown of the benefits of the deal indicates that Carrols insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Carrols.

38.    For example, Company insiders, currently own large illiquid blocks of Company stock, company options, restricted stock units, and other equity awards, all of which will be converted into the Merger Consideration not shared with public Company stockholder such as Plaintiff upon the consummation of the Proposed Transaction as follows:

| Name | Carrols Common Shares (#) | Value of Carrols Common Stock ($) | Company Options (#) | Value of Company Options ($) | Company RSAs and RSUs (#)[1] | Value of Company RSAs and RSUs ($)[1] | Company PSAs and PSUs (#)[2] | Value of Company PSAs and PSUs ($)[2] | Total Value ($) |
|---|---|---|---|---|---|---|---|---|---|
| Deborah M. Derby | 89,149 | 851,373 | — | — | 583,819 | 5,575,471 | 1,023,636 | 9,775,724 | 16,202,568 |
| Anthony E. Hull | 367,297 | 3,507,686 | 100,000 | 243,000 | 205,199 | 1,959,650 | 313,615 | 2,995,023 | 8,705,360 |
| Joseph H. Hoffman | 128,345 | 1,225,695 | 75,000 | 182,250 | 72,898 | 696,176 | 130,448 | 1,245,778 | 3,349,899 |
| Richard G. Cross | 220,900 | 2,109,595 | 75,000 | 182,250 | 57,099 | 545,295 | 84,950 | 811,273 | 3,648,413 |

| Name | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ahmed Filsoof | 24,234 | 231,435 | — | — | 53,162 | 507,697 | 67,905 | 648,493 | 1,387,625 |
| Jared L. Landaw | 100,734 | 962,010 | — | — | 76,148 | 727,213 | 125,448 | 1,198,028 | 2,887,252 |
| Nathan Mucher | 63,447 | 605,919 | 25,000 | 60,750 | 39,517 | 377,387 | 66,905 | 638,943 | 1,682,999 |
| Gary McQuillan | | | | | 14,000 | 133,700 | 20,016 | 191,153 | 324,853 |
| Gretta B. Miles | 47,690 | 455,440 | 25,000 | 60,750 | 48,600 | 464,130 | 9,000 | 85,950 | 1,066,270 |
| Gerald J. DiGenova[1] | — | — | — | — | — | — | — | — | — |
| David S. Harris | 192,024 | 1,833,829 | — | — | 75,763 | 723,537 | — | — | 2,557,366 |
| Hannah S. Craven | 114,417 | 1,092,682 | — | — | 55,976 | 534,571 | — | — | 1,627,253 |
| Thomas B. Curtis | — | — | — | — | — | — | — | — | — |
| Matthew Dunnigan | — | — | — | — | — | — | — | — | — |
| Lawrence E. Hyatt | 91,423 | 873,090 | — | — | 55,976 | 534,571 | — | — | 1,407,661 |
| Matthew Perelman | 239,135 | 2,283,739 | — | — | 55,976 | 534,571 | — | — | 2,818,310 |
| Alexander Sloane | 108,185 | 1,033,167 | — | — | 55,976 | 534,571 | — | — | 1,567,738 |
| John D. Smith | 25,000 | 238,750 | — | — | 60,407 | 576,887 | — | — | 815,637 |

39.   In addition, employment agreements with certain Carrols executives entitle such executives to severance packages should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant and will grant each director or officer entitled to them millions of dollars, compensation not shared by Plaintiff as follows:

| Name | Cash ($)[2] | Equity ($)[2] | Perquisites/ Benefits ($)[3] | Nonqualified Deferred Compensation ($)[4] | Total ($) |
|---|---|---|---|---|---|
| Deborah M. Derby | 1,625,000 | 15,351,195 | 28,037 | — | 17,004,232 |
| Anthony E. Hull | 1,681,063 | 5,197,674 | 54,161 | 81,371 | 7,014,269 |
| Jared L. Landaw | 874,500 | 1,925,242 | 3,965 | 42,584 | 2,846,291 |
| Richard G. Cross | 819,844 | 1,538,818 | 30,814 | — | 2,389,476 |
| Joseph W. Hoffman | 992,906 | 2,124,204 | 28,490 | — | 3,145,600 |
| Paulo A. Pena | — | 1,432,500 | — | — | 1,432,500 |
| Daniel T. Accordino | — | — | — | — | — |

| Name | Base Salary Severance ($)[a] | Bonus Severance ($) | Total ($) |
|---|---|---|---|
| Deborah M. Derby | 975,000 | 650,000 | 1,625,000 |
| Anthony E. Hull | 1,031,063 | 650,000 | 1,681,063 |
| Jared L. Landaw | 634,500 | 240,000 | 874,500 |
| Richard G. Cross | 594,844 | 225,000 | 819,844 |
| Joseph W. Hoffman | 674,156 | 318,750 | 992,906 |

| | | | |
|---|---|---|---|
| Paulo A. Pena | — | — | — |
| Daniel T. Accordino | — | — | — |

40.     The Preliminary Proxy Statement also fails to adequately disclose the totality of the communications regarding post-transaction employment during the negotiation of the underlying transaction. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.

41.     This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

42.     Thus, while the Proposed Transaction is not in the best interests of Carrols, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Preliminary Proxy Statement***

43.     On March 4, 2024, the Carrols Board caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy Statement that, in violation the Exchange Act, failed to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

44.     The Preliminary Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Preliminary Proxy Statement fails to disclose:

a.   Why the Special Committee was given the power to reject any potential transaction but not the power of final approval for entering into a potential transaction;

b.   Whether the confidentiality agreements entered into by the Company with RBI differed from any other unnamed confidentiality agreement entered into between the Company and potentially interested third parties (if any), and if so, in all specific manners;

c.   Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders; and

45.     This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of Plaintiff and Company stockholders.

*Omissions and/or Material Misrepresentations Concerning Carrols's Financial Projections*

46.     The Preliminary Proxy Statement fails to provide material information concerning financial projections for Carrols provided by Carrols management to the Board and Jefferies and relied upon by Jefferies in its analyses. The Preliminary Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

47.     Notably the Preliminary Proxy Statement reveals that as part of its analyses, Jefferies reviewed, "certain information furnished to Jefferies by Carrols' management and approved for Jefferies' use by the Special Committee, including financial forecasts and analyses, relating to the business, operations and prospects of Carrols (the "Company Projections")."

48.     Therefore, the Preliminary Proxy Statement should have, but fails to provide, certain information in the projections that Carrols management provided to the Board and Jefferies. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

49.     With regard to the *Unaudited Company Projections* provided by Carrols Management, the Preliminary Proxy Statement fails to disclose material line items for the following metrics:

    a.  Revenue, including all underlying inputs, metrics, and assumptions used to calculate same;

    b.  Adjusted EBITDA, including all underlying inputs, metrics, and assumptions used to calculate same, including specifically: earnings before interest, taxes,

depreciation and amortization; stock-based compensation; and pre-opening expenses;

c.  Capital Expenditures, including all underlying inputs, metrics, and assumptions used to calculate same;

d.  Changes in Net Working Capital, including all underlying inputs, metrics, and assumptions used to calculate same; and

e.  Free Cash Flow, including all underlying inputs, metrics, and assumptions used to calculate same.

50.  The Preliminary Proxy Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

51.  This information is necessary to provide Plaintiff in his capacity as a Company stockholder, a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

52.  Without accurate projection data presented in the Preliminary Proxy Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of Jefferies financial analyses, or make an informed decision whether to vote in favor of the Proposed Transaction.  As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

_Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Jefferies_

53.  In the Preliminary Proxy Statement, Jefferies describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to

include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations, or evaluate the fairness opinions.

54.     With respect to *Selected Public Companies Analysis,* the Preliminary Proxy Statement fails to disclose the following:

a.   The specific metrics for each corresponding public company;

b.   The underlying inputs, metrics, and assumptions used to determine the EV/FY 2023E Adjusted EBITDA Multiples for the Public Franchisees;

c.   The underlying inputs, metrics, and assumptions used to determine the EV/FY 2024E Adjusted EBITDA Multiples for the Public Franchisees;

d.   The underlying inputs, metrics, and assumptions used to determine the EV/FY 2023E Adjusted EBITDA Multiples for the Limited-Service Restaurants;

e.   The underlying inputs, metrics, and assumptions used to determine the EV/FY 2024E Adjusted EBITDA Multiples for the Limited-Service Restaurants;

f.   The underlying inputs, metrics, and assumptions used to determine the EV/FY 2023E Adjusted EBITDA Multiples for the Full-Service Restaurants;

g.   The underlying inputs, metrics, and assumptions used to determine the EV/FY 2024E Adjusted EBITDA Multiples for the Full-Service Restaurants;

h.   The underlying inputs, metrics, and assumptions used to determine the EV/FY2023E Adjusted EBITDA Multiples of 6.25x to 7.25x applied to Company; and

i.    The underlying inputs, metrics, and assumptions used to determine the EV/FY2024E Adjusted EBITDA Multiples of 6.0x to 7.0x applied to Company.

55.     With respect to the *Discounted Cash Flow Analysis*, the Preliminary Proxy Statement fails to disclose the following:

    a.   The terminal values for Company, calculated;

    b.   The present value of the Company's Net Operating Losses, work opportunity and tax credits and the underlying metrics, inputs and assumptions used to determine the utilized discount rate of 15.5%;

    c.   The underlying inputs, metrics, and assumptions used to determine the perpetuity growth rates ranging from 2.5% to 3.5% utilized;

    d.   The underlying inputs, metrics, and assumptions used to determine the discount rate range of 11.0% to 13.0% utilized;

    e.   The underlying inputs, metrics, and assumptions used to determine Carrols's weighted average cost of capital utilized;

    f.   The underlying inputs, metrics, and assumptions used to determine the discount rate of 15.5% utilized based on an estimate of Company's cost of equity; and

    g.   The number of fully-diluted outstanding shares of Carrols common stock as of December 31, 2023.

56.     With respect to the *Selected Transactions Analysis,* the Preliminary Proxy Statement fails to disclose the following:

    a.   The specific date on which each selected transaction was consummated;

    b.   The aggregate value of each selected transaction; and

    c.   The underlying inputs, metrics, and assumptions observed in the Selected Transactions Analysis.

57.     With respect to the *Premiums Paid Analysis*, the Preliminary Proxy Statement fails to disclose all underlying inputs, metrics, assumptions and data observed in Jefferies' review of its Premiums Paid Analysis.

58.     These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

59.     Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the Proposed Transaction truly maximizes his value and serves his interest as a stockholder. Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public Carrols stockholder. As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

## FIRST COUNT

## Violations of Section 14(a) of the Exchange Act

## (Against All Defendants)

60.     Plaintiff repeats all previous allegations as if set forth in full herein.

61.     Defendants have disseminated the Preliminary Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

62.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction. Specifically, Section 14(a) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC]

may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security)

registered pursuant to section 78*l* of this title.

63.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy

statement, form of proxy, notice of meeting or other communication, written or

oral, containing any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make

the statements therein not false or misleading or necessary to correct any statement

in any earlier communication with respect to the solicitation of a proxy for the same

meeting or subject matter which has become false or misleading.

64.     The Preliminary Proxy Statement was prepared in violation of Section 14(a)

because it is materially misleading in numerous respects and omits material facts, including those

set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have

known that the Preliminary Proxy Statement is materially misleading and omits material facts that

are necessary to render them non-misleading.

65.     The Individual Defendants had actual knowledge or should have known of the

misrepresentations and omissions of material facts set forth herein.

66.     The Individual Defendants were at least negligent in filing a Preliminary Proxy

Statement that was materially misleading and/or omitted material facts necessary to make the

Preliminary Proxy Statement not misleading.

67.     The misrepresentations and omissions in the Preliminary Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to vote his shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## SECOND COUNT

## Violations of Section 20(a) of the Exchange Act

## (Against all Individual Defendants)

68.     Plaintiff repeats all previous allegations as if set forth in full herein.

69.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

70.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy Statement; and nevertheless, approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy Statement. The Individual Defendants were provided with copies of, reviewed and approved,

and/or signed the Preliminary Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

71.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Carrols's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Preliminary Proxy Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

72.     The Individual Defendants acted as controlling persons of Carrols within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Carrols to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Carrols and all of its employees.  As alleged above, Carrols is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

A.     Enjoining the Proposed Transaction;

B.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.     Directing the Individual Defendants to exercise their fiduciary duties to disseminate

a Preliminary Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: March 12, 2024                    **BRODSKY & SMITH**

By: *Evan J. Smith*
                                        Evan J. Smith
                                        240 Mineola Boulevard
                                        Mineola, NY  11501
                                        Phone:  (516) 741-4977
                                        Facsimile (561) 741-0626

                                        *Counsel for Plaintiff*